The next case on the calendar is United States v. Darren Goodrich. Good morning, Your Honors. May it please the Court, my name is Nathaniel Marmer, and I represent Darren Goodrich on this appeal. Your Honor, Darren Goodrich pled guilty to and accepted responsibility for his role in an open market pump and dump scheme. When he pled guilty, he expected and agreed to certain consequences of that plea. He understood that he would be going to jail, likely for 41 to 51 months. He understood that he would have to forfeit his meager profits from that scheme, which were about $4,000. And he understood that there would be restitution paid to open market investors. Even though he had only traded in about $40,000 worth of cubed stock, there were market investors who had lost some greater amount, which turned out to be about $600,000, and he would be responsible for that number. What he did not expect and what he did not agree to was that two years later, the government would seek to hold him responsible for a number four times that amount, based on — Well, he doesn't have to agree to it. Well, he has to agree to pay restitution for the offense that he's pleading guilty to, right? Right. The question is really what is the offense to which he pled guilty. Right. Every indication — If the losses of the private placement victims were approximately caused by his conduct. Well, there are, I think, two ways to look at this. We have two arguments. Could you speak a little more into the microphone? I apologize. My wife says I do that, too. I don't speak loudly enough. Okay. Thank you. So there's two arguments. The first is that the parties, by their conduct, defined and circumscribed the offense as the public market offense. Right? It's losses to those public market investors. So this is the offense of conviction that you're describing? That is the offense of conviction. And that is my first point. And I can address that and then move on to what is assuming that the court finds that the offense was more broadly stated, whether he, in fact, reasonably foresaw the losses that were caused to the private placement investors. Why weren't the private placement offer victims, people who purchased stocks through the private placement, equally victims of his offense because he was trading in stocks that helped raise the value and create an aura of there being an active market, setting a certain price, and so on? Why weren't they equally victims of his conduct? Well, that was, as defined, a separate scheme. There are, I suppose, when someone manipulates the price of stock, any number of ways that someone could then take that stock and cause all sorts of other types of harm. For example, in the Paul case, which the government relies upon, the defendant there pledged securities to a bank, right? Securities that had been fraudulently inflated. And, of course, that causes a bank ultimately to lose money. And there, what the court looked at was the fact that the banks had been specifically mentioned in the indictment and that the defendant, in his allocution, expressly recognized that he had pledged those securities and that they had caused those losses. Here, what the conspirators did was, Darren's role was to participate in this open market fraud, which caused the stock to go up and then fall, and those investors lost money. The conspirators were also running a separate private placement scheme in which they were showing investors, here is this stock, you should invest in it because it's worth X, and you will, you know, and that money was... Don't we have two separate questions? One, a question of whether your client could foresee, knew in some way, that people might be injured through the private placement because of what he was doing, and so that he was potentially guilty of that. And that's a question of fact, where there may be facts or not. But the other question, which I take it you are arguing, is did he plead guilty to this except the requirements of the other? That is, was that part of what he was pleading guilty, or to use what the Fifth Circuit said, was it beyond the mutual understanding of the parties as to the guilty plea? Because that's a question of law, and if we say that you can't do that, then because you can't take into account collateral consequences on restitution, as you can on sentencing, then you're in the clear. But they're two separate things. Absolutely, and I'm trying to keep them distinct, and you focused on the legal part, and I want to address that. I do not want to give up on the factual part, because I think we have an extremely strong argument that the Court relied on two inferences from a transcript, which I think even the government has to concede are wrong. But let me start with the legal point, which is this Court and others and Judge Clement in the Fifth Circuit talks about in a plea agreement situation, the need to respect what the parties have reached as an agreement and the reasonable expectations of the defendant. And that goes to how are they defining the offense, notwithstanding the breadth of the indictment. Here, in fact, the indictment, which is 30 pages, describes in detail an open market fraud. It never once mentions the word private placement. Now, Darren agrees to plead guilty to that, and they have a plea agreement, and they negotiate it. And it says you'll plead guilty to count one, and count one is that count that doesn't mention a private placement. They say we will also calculate losses for guidelines purposes. How do we do that? We'll look at the victims. The victims lost $1.75 a share. That is the open market losses. Nowhere does the government say there's also private placement losses. Those are calculated differently. No. Then they go to the allocution. The allocution at the plea is completely based on the open market scheme. There is no mention of a private placement by Darren Goodrich. The government, when asked what it would prove, does not mention a private placement, does not give the defendant any notice that at some point he's going to be held responsible for that. To the contrary, it reiterates the point that the guidelines, the losses, the victims are being identified as open market victims. Then we have PSR and three addenda. Not once does the PSR mention a private placement, much less give the court a factual basis to determine how to calculate losses from that. It's only two years later, after the plea, after the trial, where the government on the eve of sentencing comes up and says there's a private placement here. So in terms of the legal question, we do take a lot out of Judge Clement's decision. I don't think it's necessary, but it does provide a framework for analysis that other circuits and district courts have used to respect the rights of the expectations of the party. Counsel, the government argues that the losses in the private placement part of this case are attributable to what went on in the open market fraud. Isn't that correct? They think they're not unrelated. They do think they are. Well, I don't know if that's true at the time of the plea because there was no mention of it there. Certainly now, after much time had passed, they said, well, we think that these are related. If they were so related, one might have thought they would have mentioned it in the indictment, in the plea. But that's a separate question. The question of whether they are related and that could have been made part of what you pled to is one question. And I think probably they are related and could have been. But the question you're saying is whether they are related or not. Was that what your client pled to? And that's what I just addressed. And if I can move briefly, and I know my time is up, but I'd like to address the factual aspect of it quickly, if I may. Take a minute. I'll take a minute. I'm watching the clock. And the judge made the determination that Darren Goodrich knew about the private placement based on two facts from a single phone call. One, that if he knew of Kyleen Cain, who ran the private placement, then he must have known the private placement. Untrue. The government, I don't know if they say we admit it, but their brief is replete with references to the fact that Goodrich knew of Cain because of her role in the escrow. A separate tranche of stock. I would love to hear. Escrow with the public placement. Yes. Unquestioned. Right? The second one, he says, well, at a buck, because they were only being sold at a buck out of the private placement. Untrue. The escrow shares were being sold at a buck, as the government said in its closing in the Discala case, and I don't think we'll dispute now. Where the judge went wrong was he said the conspirators are trying to compensate Goodrich, other than his commissions, by giving him cheap stock. But they weren't doing so through private placement stock. It's abundantly obvious, as the government says in its brief, that they were trying to give him discounted escrow shares at a quarter. He's not buying dollar private placement shares, which are being sold to victims and are going to be locked up for a year. That's not what a co-conspirator is trying to get. He's trying to get the discounted private stock at a quarter. So the judge, having misread that initial, misunderstood how this was working, then went on to make two fundamentally and clearly erroneous findings of fact. All right, we'll ask the government a new reserve of two minutes for rebuttal. Good morning. May it please the court. Shannon Jones for the United States. Please pull the microphone down just a bit. There we go. Shannon Jones for the United States. I also represented the government in the proceedings below. Darren Goodrich pleaded guilty to conspiring to commit security fraud. He participated in a scheme to artificially manipulate the price of Cube stock between April 2014 and July 2014. He helped alter the mix of available information to the investors who decided to purchase Cube stock during that period of time. The district court properly ordered Goodrich to pay restitution to the victims of that security fraud scheme. Cube investors who purchased Cube stock during the time frame that Darren Goodrich was helping to artificially manipulate that stock price. I don't think there's any disagreement. I didn't hear any from counsel on the restitution related to the Cube stock. This is all Cube stock. The private placement stock is Cube stock, and the open market stock is Cube stock. It's all the same stock. But why isn't it reasonable to adopt the rule that the Fifth Circuit and at least one other seem to have adopted that we need to, in the context of a plea agreement, this is not after trial where the scope of the conspiracy has been established, why isn't it reasonable to be concerned at least that the indictment doesn't mention the private placement operation, which could have been conducted quite separately, so the indictment doesn't, the plea agreement doesn't, nothing happened in the plea colloquy that referred to the private placement aspect that the district court now relies on in its restitution order. It seems to me unfair to do that, and it seems to me that the Fifth Circuit's rule is a reasonable one to look at the intent of the parties at the time the plea agreement was entered into. What's wrong with that approach? Well, Your Honor, when you look at Adam's decision, where the defendant particularly, he just allocated to, he specifically allocated to only participating in two accidents. So in that case, I think there were 12 accidents, and in the two substantive counts that he pled guilty to, during his allocution, he only admitted that he was involved in those two particular accidents, and he denied being involved in those. You might distinguish Adam's in a particular way, but I'm asking what's wrong with a rule that says in looking at what the offense of conviction is, especially in the conspiracy context, we should not look at the party's intent at the time the guilty plea was entered, and look at the plea agreement, the indictment, and other indicia of the scope of the crime, where it can be so variable. It seems unfair. Why is it not unfair to do that? Your Honor, in this case, count one includes four different stocks. There were the Cube stock, Code Smart, StarStream, and the staffing group. The parties in the substantive counts for those individuals... All that is very well, but don't we interpret plea agreements as we do contracts? And if we're talking about a contract, I'm not terribly interested in whether this guy is a nice guy, a bad guy, whether he could have foreseen that because of what he was doing, other people might jump in and do other schemes. The question is, what did he agree to when he pled? And if we start interpreting plea agreements broadly later, then we give the government an amazing amount of power to change a deal. He pled guilty to securities fraud with respect to Cube stock. Conspiracy. Conspiracy, that's right. And if you look at the indictment as a whole, the indictment lies out how the co-conspirators were able to get control of the stock, manipulate the stock, and persuade investors to invest in the stock. A.J. DeScala claimed to be a merchant bank. In the indictment, we describe what his company, Omniview, was. His company would come to these private companies and persuade them, basically, to let him have control. Well, we have to focus on this defendant and what this defendant thought he was agreeing to at the time and what the scope of his acts comprehended. Absolutely, but these schemes to manipulate the stock do not work without raising money for the company, and the way they raise money for the company is through this private placement. But that can happen in different ways. Again, I'm not hearing the answer to my question, why it is unreasonable to look at the understanding of the parties at the time the plea agreement was entered into. Is there a reason we should not do that? Because I don't think there was an understanding that the defendant's offensive conviction was only limited to stock or purchase on the open market. I think you're putting it backwards. You plead to what you plead. It's up to you to show us that there was an understanding that that agreement that on its face is only as to X was actually an agreement as to X plus Y plus Z. It's not up to the person who makes the agreement to show that all sorts of other things were not included. So show us why when he made this plea he was agreeing to deal with all the other things that people, with or without his knowledge, it's a separate fact question, were taking advantage of what was going on to make other monies. I mean, there's no doubt that people were selling at $1 because the price was artificially inflated. There's no doubt that people were taking advantage of that. The question is, is that what he pled to? Your Honor, in his plea allocution, he pled guilty to artificially manipulating the price of cubed.  Cubed investors who bought that stock were deceived into believing that stock was worth more than it was. It was worthless stock. And they ended up paying, regardless if they paid $6 or $1, they paid based on his fraud. You keep coming back to telling me something that I agree with you completely, that people were selling at $1 a share and other people were buying at $1 a share because the price was at $6.50. And I don't, you know, I agree with you, but that doesn't come back to answer the question that I'm asking. Your Honor, the MVRA provides that if a victim is directly or approximately harmed by the offense of conviction, then they are victims here. The offense of conviction here was falsely influencing the market to believe that the stock had value when, in fact, it did not. And that is why these people invested. Now, I want to make clear. In the context of a plea agreement, the boundaries of the offense of conviction rely on the understanding of the parties at the time the agreement is entered into, doesn't it? Right, but I think he completely understood that he was agreeing that he had committed security fraud and falsely informed the public that this stock was worth something when it wasn't. Counsel, you heard his opening remarks saying this wasn't in the indictment? It wasn't in the plea agreement? He wants to focus on the pump and dump and the open market trades because that is how the stock was manipulated. The stock was manipulated through these matched and coordinated trades, which his client participated in. And the government's argument is because it was the same stock in the pump and dump and in the private placement, that that was enough notice to this defendant that he would pay the damages related to both schemes. It was one scheme, and it's a three-month period of time where these people invested in the stock, partially in reliance on what the open market said the stock was worth. Could you, for a moment, address the factual question? Yes, please, let me do that. Wait, let me put it. What evidence is there that he actually knew that people were doing that? Because, you know, that's a separate question from the legal question, but if factually he didn't even know, then we don't even get to the legal question. Absolutely, and I wanted to make sure that I did address that, because there was a big disagreement between the government and the defendant about the facts of this case and about that instance. There is a copy of the transcript of the call in the appendix that Goodrich provided, and when you look at the discussion between Goodrich and Piscala about what Kylene Kane is doing, based on what was the background facts, and, you know, Judge Vitaliano did sit through a five-week trial about this case, so he had a very good understanding of this. There were – Kylene Kane was doing a variety of things. One of the things she was doing was she was in charge of the private placement, and she was coordinating the sale of the stock at $1 a share for the company. She prepared a private placement memorandum. She had the paperwork that she would send out. Was she also acting as escrow agent with respect to the public trades? Yes, that's a different category of stock. But let me say that the – so when we talk about what Kylene Kane has for a buck and the documentation she has, the only thing that Kylene Kane is selling at a buck is the private placement shares. The only documentation she's prepared about the shares is the private placement shares. A.D. Piscala and his crew of people on the side, they are taking the escrow shares that Kylene Kane controls, which are in the name of nominees. These are the free trading shares. She has complete control over them. She is the only one who is able to deposit those free trading shares into a broker's account that can be sold. A.D. Piscala and his group of people, they're saying, oh, Kylene Kane controls 8 million free trading shares on our behalf, that she has an escrow. So we on the side are going to go among various people, some victims, some co-conspirators, and we're going to distribute those free trading shares amongst ourselves, and he's selling them for $1 a share. So Piscala has his own separate set of additional victims, which we had originally included in our first restitution letter below the district court, but then we carved out by the final hearing because we said, well, maybe that was not reasonably foreseeable to Darren Goodridge, that Piscala and his crew were selling those escrow shares, which Darren Goodridge fully understood that Kylene Kane controlled, and that was how they were manipulating the price and able to control supply and demand so closely to walk the price up from 5 to 7, but he may not have understood that on the side, Piscala was taking those escrow shares that he didn't own, he didn't control, were not in his name, that Kylene controlled and was selling those for $1 a share. Kylene Kane, because she controlled the escrow, she controlled the free trading shares, she and Piscala could agree, oh, okay, we're going to sell some of those escrow shares to Darren Goodridge at $0.25 a share as sort of a kiss and make nice for all the help he's doing that, and that's how he was going to profit from the scheme, which did not happen because the SEC halted trading when Piscala and Kane were arrested in July in 2004. This was stopped in the middle of the pump of the pump and dump phase, and so a lot of these profits and, you know, ideas about how they were going to make money here were not realized. Okay. Thank you. All right. Thank you. Mr. Morimer, I think you reserved two minutes. I did. Thank you, Your Honor, and I hope not to use it all. Judge Carney, I think, made a very good point, as supplemented by Judge Calabresi, which is particularly looking at plea agreements in conspiracy cases. They tend to be, conspiracies tend to be, if not boundless, very ill-defined at the contours, and that makes it harder, especially for a defendant, to understand what he's going to be ultimately responsible for after being detailed, detailed allocution on sentencing, but restitution tends to be a little more difficult to predict. And so here I think that applies on all fours because we actually don't even speak about this other separate scheme, and I think that Judge Pooler, I'm sorry, Judge Carney was right to ask about the Adams case and what sort of guidance that can give us because the theme of Adams and Collardoe, which we cited, and there are some others from other circuits which, whether they use the terms mutual understanding or not, come from the same place, and that is what are the reasonable expectations, particularly of the defendant in this circumstance. This Court noticed but did not resolve that particular test in the, I believe it's the Sang unpublished opinion, but I think sometimes in oral argument it's nice to give the Court some idea of when it's an appropriate opportunity to write on an issue, and I think this case, respectfully, is an opportunity to adopt that test. It's preserved. The factors are very clear. We have each of those steps here. We have the issue about the indictment, about the plea, about the allocution. Let me tell you what is sort of troubling me in these cases. If the question is how many years in jail your client should spend, then the fact that he didn't plead directly to anything concerned, is your argument, with this broader scheme, this private placement scheme, wouldn't matter because the Court could take that into account if they thought they knew, your client knew about it enough as other circumstances, and in sentencing, to send to jail, they can do that. With respect to restitution, it's been held you can't do that. And that's the real issue here. I don't think the government would be pushing the broader issue if it were a question of you're getting not 51 months but getting 72 months because of this other one, because that would be perfectly fine. So they are asking us to read it more broadly with respect to restitution because they cannot do the other thing. But what's wrong with that? Mr. Goodrich has been sentenced to a lifetime of indentured servitude based on a $2,400,000 or $2,000,000 judgment, on top of the $800,000 he's already paid. So I don't think it's fair to structure this as a debate between what's more important, incarceration or restitution. Having represented many criminal defendants over my life, I can say, unfortunately, some have valued one over the other, and they don't all necessarily agree. But it's just as important during the allocution and during the proceedings for the defendant to understand the consequences and also to respect the fact that there's been a negotiation. There's been documents provided to the defendant. There's been an indictment. There's been negotiations. There's been a plea agreement. There's been a plea proceeding. All of that informs the defendant of what are the reasonable expectations of this solemn moment where he pleads guilty and takes responsibility for an offense. The government counsel, Ms. Jones, said this was all one scheme. He had to have known that this would be a charge against him when they toted up the damages. Well, as I think some of the court's questions pointed out, is that when you do a scheme that pumps up the value of a stock, people can do other things once that stock is inflated. They can pledge it. There can be all sorts of ripple effects. But that scheme was to sell stock, this other scheme by Discala, nothing to do with Goodrich, was to sell stocks to private investors. Doesn't the government say, though, that the private scheme was essential to support the public market pump and dump? I'm not sure it works both ways, and I'm not sure it matters. But certainly pumping up the stock does facilitate the private market scheme because they're relying on that higher price. I thought you were saying that the private schemes helped finance. I think that's what you wrote in your brief, helped finance the public. Not sure which one it was that helped finance because the conspirators took the money. It kept the company going for the relevant period. They overlapped in time. They did overlap in time. But, again, the point is that they are still schemes can overlap, schemes can relate to each other or assist each other. But as the parties proceeded in this case, they defined those schemes. Well, they only really defined one scheme, which was this public market scheme. And they talked about, even during the allocution, the purpose of this was to defraud the public market investors. The government said it was only one scheme, no matter what, no matter how it was denominated. This was one scheme relating to one stock, and that there should be no surprise on the part of Mr. Goodrich because he was involved in the entire scheme. Well, I suppose then one could say that, you know, if someone pledged to a bank and the bank lost $100 million making a loan, that that would be part of the same scheme, too. There are boundaries to this, and the parties discussed it. That's what we are trying to discern, what the boundaries are. And you make it a question of notice. Was he on notice that he might be liable for all the damages from the entire scheme? And the government says he was always on notice this was one scheme. Well, I don't think it's just notice. It's also about reasonable expectation. It's certainly something this Court has emphasized, but it's also what the agreement is and how they have defined it. One could say, in Adams, he was on notice that there were other parts of this, other car accidents, but they defined it saying, okay, you're doing it and you're responsible for these, too. Here it's a little difficult because what seems clear is that the government, despite all the evidence it had, didn't seem to know about the private placement scheme that they are now saying was reasonably perceivable to Darren Goodrich. The government had thousands of hours of tapes, documents, cooperators, and it appears that they don't think about this or understand this until two years after Darren's plea, when all of a sudden they say there's a private placement scheme here. If it was so integral, they would have put it in the indictment. They put the escrow account. They put those shares in the indictment. They put the public market shares in the indictment, but they didn't have any mention of this supposedly integral scheme, the private placement, in the indictment. All right. Okay. Thank you. Thank you, Your Honor. Thank you both very much. We'll reserve decision.